# IN THE UNITED STATES DISTRICT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JAMES B. SMITH, On Behalf of Himself and Others Similarly Situated,** | : | **CIVIL ACTION** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **NO. 96-7580** |
| | : | |
| **DOMINION BRIDGE CORPORATION (f/k/a CEDAR GROUP, INC.), MICHEL L. MARENGÈRE and NICOLAS MATOSSIAN,** | : | |
| | : | |
| **Defendants.** | : | |

## MEMORANDUM

LOWELL A. REED, JR., Sr. J.                                              April 11, 2007

Presently before the Court in this securities class action is plaintiff James B. Smith's memorandum of law in support of his motion for final approval of the proposed settlement and the plan of allocation (Doc. No. 48) and plaintiff's memorandum of law in support of his application for attorneys' fees and reimbursement of expenses (Doc. No. 49). This court held a fairness hearing in this matter on January 22, 2007. For the reasons which follow, this court will approve the class action settlement, the plan of allocation, the application for attorneys' fees, and the requested reimbursement of expenses. The requested award to the class representative beyond his pro rata share of the settlement will be denied.

## I.      BACKGROUND

This securities class action was brought on November 12, 1996, pursuant to section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder, and section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a), on behalf of persons who purchased or acquired common stock of Dominion Bridge

Corporation ("Dominion"), formerly known as Cedar Group, Inc., between April 20, 1995 and May 18, 1996.  In short, plaintiff James B. Smith ("Smith") alleges that from April 20, 1995 through May 18, 1996, defendants failed to disclose the following to the investment community:  (1) that Dominion's construction contracts were at risk for not being formed or were being canceled; (2) that Dominion lost $40 million in contracts for the 1996 fiscal year; (3) that Dominion lacked adequate accounting controls; (4) that its financial status lacked credibility because of inaccurate and misleading accounting practices; and (5) that Dominion was accused of violated federal securities law by a former executive.  Smith also alleges that Dominion issued several misleading statements to the press claiming success and growth during the period of time in question. (Doc. No. 1).

On June 4, 1997, Smith moved, for a second time,[1] to certify the class with one lead plaintiff as the class representative pursuant to Federal Rule of Civil Procedure 23, which defendants opposed.  (Doc. No. 16).  This court found that the prerequisites for class certification for those who had purchased common stock through the NASDAQ Stock Exchange had been met and granted the motion, in part, on March 6, 1998.  (Doc. No. 28).  Class certification was denied for those who had purchased Dominion common stock through the Vancouver Stock Exchange.  (Id).

On January 10, 1997, this court bifurcated class discovery from merits discovery, resulting in defendants' responses to Smith's merits discovery being stayed until the class was certified.  (Doc. No. 6).  In February and March of 1997, the parties exchanged initial disclosures.  (Doc. No. 47).  On March 5, 1998, after this court granted the motion for class certification, in part, the defendants were required to respond to Smith's discovery on the merits.  (Docs. No. 6, 28).  Smith represented

---

[1] Smith originally filed his motion for class certification on January 31, 1997, however, ruling on certification of the class was deferred until class discovery was completed.  (Docs. No. 9, 11).

to the court that soon after the class was certified, he engaged in a "protracted meet and confer process" with the defendants regarding his request for documents.  (Doc. No. 45, Ex. A-1).  Smith asserted that he issued several subpoenas for documents to third parties and received limited production in response.  (Id).  Smith also noticed a deposition of Dominion.  (Id).  On September 21, 1998, this court stayed discovery on the merits, except for discreet matters of discovery as agreed to by the parties, until further order of the court.  (Doc. No. 31).  Pursuant to a stipulation by the parties, on October 29, 1998, the court ordered that the individual defendants and another individual be made available for deposition by the defendants.  (Docs. No. 33, 34).

On August 11, 1998, Dominion filed a notice of intention to file a proposal in the Quebec Superior Court, Bankruptcy Division, District of Montréal, which indicated to creditors that Dominion was going to reorganize.  (Doc. No. 32).  The defendants then filed a motion on October 6, 1998, to stay the proceedings pursuant to the automatic stay imposed by the Canadian court.  (Id).  This court granted defendants' motion and stayed the proceedings on March 2, 1999.  (Doc. No. 38).

During the course of the stay, the bankruptcy trustee informed Smith that Dominion would most likely not come out of bankruptcy and would eventually cease to exist.  As a result, Smith contacted defendants to discuss settlement of the class action.  The Canadian bankruptcy court approved the settlement on March 21, 2006.  (Doc. No. 45, Ex. A-1).

Under the terms of the proposed settlement, the defendants have agreed to pay $750,000 in cash to be deposited in an interest-bearing escrow account maintained by D'Amato & Lynch within sixty days of June 21, 2002.  (Doc. No. 44, Stipulation of Settlement ¶ 2.1.)  Lead counsel petitioned this court for an award of 33⅓ percent of the settlement fund, plus reimbursement for expenses

which total $15,600.00.  (Docs. No. 44, ¶7.1; 45; 47, Ex. A-1[2]).  In addition, lead counsel moved the

court to approve incentive awards of $15,000 for Smith.  (Id).

Dominion provided the claims administrator with a list containing the identities of all record

holders of Dominion common stock who purchased or acquired their stock from April 20, 1995

through May 18, 1996.[3]  (Doc. No. 45, ¶ 6).  Each member of the settlement class who filed a timely

proof of claim will receive a share of the gross settlement fund, after payment of attorneys' fees,

expenses, and settlement administration ("Net Settlement Fund").  (Doc. No. 45, Ex. A-1).  In

accordance with the allocation plan, each member of the settlement class will receive a *pro rata*

share of the Net Settlement Fund based on his, her, or its net allowed claims.  (Id).  In consideration

for the relief provided in the settlement, defendants are released from any and all claims, "known or

unknown, suspected or unsuspected, contingent or non-contingent, whether or not concealed or

hidden, which now exist, or heretofore have existed upon any theory of law or equity now existing

or coming into existence in the future," that "are based upon or related to both the purchase of

---

[2]Document 47 contains two exhibits labeled A.  For the sake of clarity, the court refers to the second exhibit A as exhibit A-1.

[3]Although this court in its March 6, 1998 order (Doc. No. 28)excluded those persons or entities that had purchased Dominion common stock during the relevant time period through the Vancouver Stock Exchange, the record reveals that individual notices of the pending settlement were mailed to all persons or entities who purchased Dominion common stock during the relevant time period, regardless of whether the stock was purchased through the NASDAQ Stock Exchange or the Vancouver Stock Exchange.  (Doc. No. 53, Affidavit of Marlene Hurwitz).  The individual and summary notices included a class definition that did not exclude those persons or entities who purchased the stock through the Vancouver Stock Exchange.  Since this settlement only applies to those who purchased stock through NASDAQ during the relevant time period, this court requested that the 93 proof of claims that were submitted be examined to ensure that they were not related to stock purchased on the Vancouver Stock Exchange.  An affidavit was filed by a manager of the claims administrator stating that, "none of the stock represented in any of the 93 claim forms appears to have been purchased on the Vancouver Stock Exchange" and that the claims administrator is "not aware of any other criteria that might be used to determine from the claim forms whether the stock was purchased on the Vancouver Stock Exchange."  (Id).  Defense counsel has informed this court that his clients have no objection to approval of the settlement on this basis.  Since those who purchased stock through the Vancouver Stock Exchange apparently did not submit proof of claims and the parties have no objections, the over inclusive notice has, in a sense, resolved itself and needs no further correction by the court.

Dominion common stock by any Settlement Class member during the Settlement Class Period and

the facts, transactions, events, occurrences, acts, disclosures, statements, omissions, or failures to act

which were or could have been alleged in the Litigation or any other forum, based upon, relating to

or arising from the facts which were or could have been alleged." (Doc. No. 44, Stipulation of

Settlement, ¶¶ 1.15, 1.24).

On November 17, 2006, and pursuant to this court's order preliminarily approving the

settlement, a total of more than 3,848 notices were mailed to potential class members. (Doc. No.

47, Michael Rosenbaum Aff. ¶ 6.) That notice expressly informed class members how to file

objections to the settlement. (Doc. No. 47, Ex. A-1). The members were instructed to file

objections with the Clerk of the United States District Courthouse, Eastern District of Pennsylvania,

no later than January 8, 2007. (Id). The record reveals that no objections were filed, and no

objectors appeared at the fairness hearing. A summary notice was published in a national

publication, PR News Wire, on November 21, 2006. (Doc. No. 48). No valid requests for

exclusion from the class were received.[4] (Id).

On January 22, 2007, this court held a fairness hearing concerning the proposed settlement

and payment of attorney's fees and costs, as well as an award to the class representative. The court

has reviewed the extensive written submissions of the parties, and in light of those submission, and

the hearing, I now turn to the merits of the instant motion.

---

[4]One woman stated that she wanted to be excluded, however, she could not have been a valid member of
the settlement class because she stated she had [n]o activity with any shares during the Settlement Class Period."
(Doc. No. 47, Ex. A). Therefore the letter is not a valid request for exclusion.

## II.    DISCUSSION

### A.    The Settlement

Under Federal Rule of Civil Procedure 23(e), this court "acts as a fiduciary" guarding the rights of absent class members and must determine whether the proffered settlement is "fair, reasonable and adequate."[5]  In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 534 (3d Cir. 2004) (quoting In re Gen. Motors Corp. Pick-Up Truck Fuel Tank, 55 F.3d 768, 785 (3d Cir. 1995)). The decision of whether to approve a proposed settlement lies in this court's sound discretion.  See In re Warfarin, 391 F.3d at 535;  Girsh v. Jepson, 521 F.2d 153, 156 (3d Cir. 1975).  "A proposed settlement which is negotiated at arms-length by capable counsel after meaningful discovery is presumed to be fair and reasonable."  In re Gen. Instrument Sec. Litig., 209 F. Supp.2d 423, 429 (E.D. Pa. 2001).

In reaching its decision, this court is guided by the following factors: (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of

---

[5]Before a court approves a proposed settlement, the court must determine if the requirements of Federal Rule of Civil Procedure 23 have been met with regard to class certification and adequate notice to class members.  In re Ikon Office Solutions, Inc. Sec. Litig., 209 F.R.D. 94, 100 (E.D. Pa. 2002);  Phillips v. Philadelphia Hous. Auth., No. 00-4275, 2005 WL 105151, at *3 n.2 (E.D. Pa May 2, 2005).  In an order dated March 6, 1998, this court conducted a detailed analysis under Rule 23(b)(3) and certified a class consisting of "all purchasers of Cedar Group, Inc. common stock only on the NASDAQ Stock Exchange during the period April 20, 1995 through May 18, 1996, inclusive."  (Doc. 28).  In 2006, this court approved the form and content of the notice and determined that the mailing and distribution of the notice in a manner and form substantially similar to that described in the order would "meet the requirements of due process, and constitute the best notice practicable under the circumstances and shall constitute due and sufficient notice to all Persons entitled thereto."  (Doc. No. 45, Notice Order, ¶ 5).  Since the mailing and distribution of the notice was substantially similar to that described in the order, adequate notice has been given.  Since these issues have been previously addressed, the court will not discuss them further.  See Phillips, 2005 WL 105151, at *3 n.2.

reasonableness of the settlement fund in light of the best possible recovery; (9) the range of

reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of

litigation.  In re Warfarin, 391 F.3d at 534-35;  Girsh, 521 F.2d at 157.  However, as the Third

Circuit noted, the "Girsh factors do not provide an exhaustive list of factors to be considered when

reviewing a proposed settlement."  In re AT&T Corp., 455 F.3d 160, 165 (3d Cir. 2006).  The

following additional factors should be included, if relevant, "the maturity of the underlying

substantive issues, as measured by experience in adjudicating individual actions, the development of

scientific knowledge, the extent of discovery on the merits, and other factors that bear on the ability

to assess the probable outcome of a trial on the merits of liability and individual damages; the

existence and probable outcome of claims by other classes and subclasses; the comparison between

the results achieved by the settlement for individual class or subclass members and the results

achieved-or likely to be achieved-for other claimants; whether class or subclass members are

accorded the right to opt out of the settlement; whether any provisions for attorneys' fees are

reasonable; and whether the procedure for processing individual claims under the settlement is fair

and reasonable."  In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions, 148 F.3d 283,

323 (3d Cir. 1998), cert. denied, 525 U.S. 1114 (1999).  The only factors, in addition to the Girsh

factors, that are relevant to this case are:  whether the settlement was the product of an arm's length

negotiation between experienced counsel and whether the allocation plan is fair and reasonable.  I

now address those factors in turn.

### 1.        The Complexity, Expense, and Likely Duration of the Litigation

This factor allows the court to determine the possible benefit, if any, of settling the case as it

relates to time and money to be expended by the parties.  In re GMC, 55 F.3d at 812.

There is no doubt that the issues in this case are complex in that the alleged misrepresentations relate to securities fraud which would have required a significant amount of expert testimony and would involve educating a jury about financial accounting and federal securities law.  Because of the highly technical issues in the case, the plaintiff could not be certain of the outcome of a factual determination by a jury.

This case is already more than ten years old, and according to the lead counsel, their firm has already spent 1,535.25 hours on the case, which resulted in $800,485.75 in attorneys' fees and expenses of $15,583.00.  (Doc. No. 46).  If the bankruptcy stay is not lifted, it is hard to say how long the bankruptcy proceedings would continue, and what, if anything, would be distributed.  Even if the bankruptcy stay were to be lifted, the additional delay of trial, post trial motions, and possible appeals could result in major expenses for each side, thereby reducing the possible amount that could be recovered.

In settling the case, the class members receive immediate benefits without having to endure protracted complex litigation, which they might not win, and especially given the insolvency of Dominion, would probably result in reduction of any possible recovery.  Thus, this factor weighs in favor of the proposed settlement.

## 2.      Reaction of the Class to Settlement

The purpose of this factor is to determine whether or not class members support the settlement.  In re Prudential, 148 F.3d at 318.   As noted *supra*, the 3,848 notices and the notice in PR News Wire have resulted in no objections and no valid requests for exclusion, even from the sophisticated institutional investors.  "This barometer of the reaction of the class provides strong circumstantial evidence in favor of the settlement."  In re General Instruments, 209 F. Supp.2d at

429.  This factor weighs strongly in favor of settlement.

### 3.    The Stage of the Proceedings and the Amount of Discovery Completed

This factor is to be used by the court to determine whether the case has been adequately

developed to truly appreciate the merits of the case when the settlement was negotiated.  In re GMC,

55 F.3d 813.  Although discovery on the merits has been stayed for much of the duration of this

case, the case has been pending for more than ten years and lead counsel have spent more than 1,500

hours working on this case.  Smith asserts that the case has been thoroughly researched, extensive

discovery was started before the stay, and the settlement negotiations took place with the merits of

both sides in mind.  In a similar case, involving shareholders suing a then insolvent company, the

court found that despite the paucity of the discovery that had occurred, since the plaintiffs had been

able to review a significant amount of documents relating to the settling defendants and given the

other Girsh factors, the factors weighed in favor of settlement.  In re Sunrise Sec. Litig, 131 F.R.D.

450, 454-57 (E.D. Pa. 1990).  Thus, this factor weighs in favor of settlement.

### 4.    The Risks of Establishing Liability

This factor and the one addressed immediately below are used to "survey the possible risks

of litigation in order to balance the likelihood of success and the potential damages award if the case

were taken to trial against the benefits of an immediate settlement."  In re Prudential, 148 F.3d at

319.  If there is a realistic risk of an unsuccessful verdict at trial, then this factor weighs towards

settlement.  In re Ikon Office Solutions, Inc. Sec. Litig., 209 F.R.D. 94, 105 (E.D. Pa. 2002).  While

counsel for plaintiff believed they had a strong case as to liability against defendants, such a finding

was not guaranteed, and defendants have maintained their denial of liability.

To prove his Rule 10b-5 claim, the plaintiff would face a heavy burden of demonstrating,

*inter alia*, that defendants were responsible for material misstatements, material omissions of fact, or commission of a manipulative act in connection with Dominion's stock; that the settlement class justifiably relied upon defendant's misconduct; and that they suffered damages as a result of that conduct.  See, e.g., Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 177-78 (1994);  In re Gen. Instruments Sec., 209 F. Supp.2d at 429-30.  Defendants were expected to argue and produce damages experts to testify that even if misrepresentations were made, those alleged misrepresentations did not have a material effect on the price of Dominion's stock.

Since stockholders normally have "little more than circumstantial and accretive evidence to establish the requisite scienter," proving scienter is an "uncertain and difficult necessity for plaintiffs."  In re General Instrument Sec., 209 F. Supp.2d at 430;  In re SmithKline Beckman Corp. Sec. Litig., 751 F. Supp. 525, 529 (E.D. Pa. 1990).  In fact, Smith anticipated presenting most of his case through the hostile testimony of the individual defendants themselves.  Because the Private Securities Litigation Reform Act ("PSLRA") requires allocation of proportionate liability, Smith's case against the individual defendants would be very complicated.  See 15 U.S.C.A. § 78u-4(f);  In re Cendant Corp. Sec. Litig., 109 F. Supp.2d 235, 261 (D. N.J. 2000).

Although it could have been possible to have obtained a higher recovery from a jury, that potential is discounted by the cost of litigation and the odds of not securing any money from a jury rather than having $750,000 to distribute.  Thus, this factor weighs in favor of liability.

### 5.    The Risk of Establishing Damages

Even if Smith was able to prove the defendants are liable, he would still have the challenge of proving damages.  Since only the amount of the stock price inflation caused by defendants' misstatements or omissions is recoverable, expert testimony is almost always critical in establishing

the amount, as well as the existence, of damages.  See  In re Cendant Corp., 109 F. Supp.2d at 262;

In re Greenwich Pharm. Sec. Litig., No. Civ. A. 92-3071, 1995 WL 251293, at *4 (E.D. Pa. Apr. 26,

1995).  This is complicated by the fact that Smith would have to demonstrate the impact of the

alleged fraud above and beyond the impact of non-actionable factors such as the national economy,

and it is very difficult to determine which of the factors a jury will find to be credible.  In re

SmithKline Beckman, 751 F. Supp. at 529.

Although Smith contends there are millions of dollars in damages, defendants vociferously

disagree.  Since there are significant risks in proving damages, this factor weighs heavily in support

of the proposed settlement.

### 6.        Risks of Maintaining Class Action

Pursuant to Federal Rule of Civil Procedure 23(c)(1)(C), a court retains the discretion to

decertify or modify a class at any time before final judgment is entered.  In re Prudential, 148 F.3d at

321; In re Rent-Way Sec. Litig., 218 F.R.D. 101, 121 (W.D. Pa. 2003).  Additionally, the defendants

could have filed a motion to bifurcate before trial so that individual issues of reliance would be

resolved in a separate proceeding.  Settlement avoids any uncertainty with respect to class

certification.  As a result, this factor weighs in favor of settlement.

### 7.        Defendants' Ability to Withstand a Greater Judgment

Dire financial condition weighs heavily in favor of settlement.  Cringle v. Golden Rule Res.,

Ltd., 194 F.R.D. 501, 509 (E.D. Pa. 2000).  Since the bankruptcy trustee informed Smith that

Dominion would most likely not come out of bankruptcy and would eventually cease to exist, there

are no "deep pockets" from which to collect any sizeable judgment.  Thus, this factor weighs

strongly in support of the proposed settlement.

**8. & 9.**     **The Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and the Attendant Risks of Litigation**

The eighth and ninth factors will be analyzed together for the sake of efficiency.  "This inquiry measures the value of the settlement itself to determine whether the decision to settle represents a good value for a relatively weak case or a sell-out of an otherwise strong case."  In re GMC., 55 F.3d at 806.  "[T]he fact that a proposed settlement constitutes a relatively small percentage of the most optimistic estimate does not, in itself, weigh against the settlement: rather, the percentage should be considered in light of the strength of the claims."  Ikon, 194 F.R.D. at 183-84.

Although the court does not know what percentage the proposed settlement is of the most optimistic potential recovery, the fact of the matter is that Dominion is insolvent, in bankruptcy, and will most likely cease to exist within the near future.  Additionally, as discussed *supra*, although Smith believes the case against the defendants is strong, liability and damages in a securities case are hard to prove and create significant uncertainties in the final outcome.  Thus, although the proposed recovery for the class is substantially less than the losses they have alleged, the dire financial situation of Dominion and the inherent risks in convincing a jury of the merits of such a case, leads this court to conclude the proposed recovery is within the range of reasonableness.

**10.     Arm's Length Negotiations and Experienced Counsel**

A court should give significant weight to the opinion of experienced counsel that the settlement is in the best interests of the class.  See, e.g., Austin v. Pa. Dep't of Corrections, 876 F. Supp. 1437, 1472 (E.D. Pa. 1995).  As noted in the order certifying the class, class counsel "has

extensive experience in representing members of securities law class actions." (Doc. No. 28).

Since it is clear that the proposed settlement was entered into in good faith, at arm's length, and

without any collusion, this factor weighs towards approval of the settlement.

**11.     Plan of Allocation**

"Approval of a plan of allocation of a settlement fund in a class action is governed by the

same standards of review applicable to approval of the settlement as a whole:  the distribution plan

must be fair, reasonable and adequate." Ikon, 194 F.R.D. at 184 (citation omitted).  "In general, a

plan of allocation that reimburses class members based on the type and extent of their injuries is

reasonable." Id.  The plan of allocation in this case is that claimants are to be reimbursed on a *pro

rata* basis for their recognized losses based on the amount paid for the Dominion common stock

they purchased or acquired during the settlement class period minus the amount realized from the

sale of such stock or taking into account the number of shares held at the close of business on May

18, 1996.  (Doc. No. 44, Exhibit A-1).  Thus, the plan is fair, reasonable, and adequate.

For the foregoing reasons, I conclude that the proffered settlement and the proposed plan of

allocation are approved.

**B.     Attorneys' Fees**

After concluding that the proposed settlement and allocation plan are fair, reasonable, and

adequate, the court must examine whether or not the requested counsel fees are reasonable.  Lead

counsel have asked the court to award attorneys' fees amounting to one third of the settlement

fund.  Two primary methods for calculating attorneys' fees exist: the percentage of recovery

method[6] and the lodestar method.[7]  The Third Circuit has determined that the former method is

"generally favored" in cases such as this one which involve a common fund,[8] as it allows "courts to

award fees from the fund 'in a manner that rewards counsel for success and penalizes it for

failure.'"  In re Cendant Corp. PRIDES Litig., 243 F.3d 722, 732 (3d Cir. 2001) (quoting In re

Prudential, 148 F.3d at 333 (explaining that the 1985 Third Circuit Task Force report

recommended that percentage fee arrangement be employed in traditional common fund

situations)).  The lodestar method, on the other hand, is more commonly used in statutory fee

shifting cases.  See Id.

The Court of Appeals has articulated the following seven factors to guide this court in

determining a proper fee award:

> (1) the size of the fund created and the number of persons benefitted; (2) the
> presence or absence of substantial objections by members of the class to the
> settlement terms and/or fees requested by counsel; (3) the skill and efficiency of
> the attorneys involved; (4) the complexity and duration of the litigation; (5) the
> risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs'
> counsel; and (7) the awards in similar cases.

Gunter v. Ridgewood Energy Corp., 223 F.3d 190, 195 n.1 (3d Cir. 2000)) (citations omitted).

However, as the Third Circuit noted, the Gunter list is not exhaustive, and other factors, such as

---

[6]  This method "resembles a contingent fee in that it awards counsel a variable percentage of the amount
recovered for the class."  In re GMC, 55 F.3d at 819 n.38.

[7]  "A court determines an attorney's lodestar by multiplying the number of hours he or she reasonably
worked on a client's case by a reasonable hourly billing rate for such services given the geographical area, the nature
of the services provided, and the experience of the lawyer."  Gunter v. Ridgewood Energy Corp., 223 F.3d 190, 195
n.1 (3d Cir. 2000).

[8]  "'[T]he common-fund doctrine. . .allows a person who maintains a lawsuit that results in the creation,
preservation, or increase of a fund in which others have a common interest, to be reimbursed from that fund for
litigation expenses incurred.'"  In re Cendant Corp. PRIDES Litig., 243 F.3d 722, 732 n.12 (3d Cir. 2001) (quoting
Court Awarded Attorney Fees, Report of the Third Circuit Task Force, 108 F.R.D. 237, 241 (1985)) (alteration in
original).

"(1) the value of benefits accruing to class members attributable to the efforts of class counsel as opposed to the efforts of other groups, such as government agencies conducting investigations; (2) the percentage fee that would have been negotiated had the case been subject to a private contingent fee agreement at the time counsel was retained; and (3) any 'innovative' terms of the settlement," should be considered.  In re AT&T, 455 F.3d at 165 (citing In re Prudential, 148 F.3d at 336-40).  It is further recommended that the fee award be cross-checked with the lodestar method.  See Gunter, 223 F.3d at 195 n.1.  Ultimately, this decision lies in this court's sound discretion.  See, e.g., Ikon, 194 F.R.D. at 192-93.  I now address the Gunter factors and the first two of the three factors mentioned in In re AT&T.

### 1.	Size of the Settlement Fund and Number of People Benefitted

This factor is examined to determine the overall benefit of the settlement and as a precautionary measure because the percentage awarded should normally decrease as the amount of the settlement fund increases, since a large fund is typically viewed as more of a function of a size of the class than the skill of the counsel.  See Cendant PRIDES, 243 F.3d at 736;  In re Rent-Way Sec. Litig., 305 F. Supp.2d 491, 513 (W.D. Pa. 2003).

The size of the settlement fund, although not particularly large, was obtained against an insolvent company that will, most likely, soon cease to exist, so the recovery could have been nothing if not for the settlement.  Additionally, the settlement fund will be paid primarily in cash, so the approximately 3,848 members of the class face little risk as to the value of the fund.  Since the settlement fund is not particularly large in the grand scheme of things[9], the court does not have to be as wary as it otherwise would that an award of 33 ⅓ percent would result in a huge

---

[9]A "mega" settlement fund is at least $50 to $100 million.  In re Rent-Way, 305 F. Supp.2d at 513 n.5.

payout for the attorneys.  Thus, this factor weighs in favor of awarding the requested attorneys'

fees.

### 2. The Presence or Absence of Substantial Objections by Members of the Class to the Settlement Terms or Requested Fees

The notice of settlement, which was sent to 3,848 potential settlement class members,

included a section informing the potential class members that lead counsel were going to apply to

the court for an award of up to one third of the settlement fund along with litigation expenses of

approximately $15,600.00 and the interest earned by that money while it was a part of the

settlement fund.  (Doc. No. 49, Ex. A-1).  The lack of objections to the requested attorneys' fees

supports the request, especially because the settlement class includes large, sophisticated

institutional investors.  See, e.g., Stoetzner v. U.S. Steel Corp., 897 F.2d 115, 118-19 (3d Cir.

1990) (The Third Circuit found after 29 of a 281 member class objected, that the response of the

class "strongly favors [the] settlement."); In re Rent-Way, 305 F. Supp.2d at 514-15 (Where 1 of

8,600 class members objected to the fee request, and no institutional investors objected, the court

found "the absence of substantial objections by other class members to the fee application

supports the reasonableness of Lead Counsel's request.").

### 3. The Skill and Efficiency of Plaintiff's Counsel

"The single clearest factor reflecting the quality of the class counsels' service to the class

are the results obtained."  Cullen v. Whitman Med. Corp., 197 F.R.D. 136, 149 (E.D. Pa. 2000)

(internal citations omitted).  As addressed *supra*, counsels' efforts have resulted in a favorable

outcome for the class, especially considering the insolvency and pending dissolution of

Dominion along with the inherent complexities of proving liability and damages in a securities

16

case to a jury.  Additionally, lead counsel have extensive experience and success in shareholder

securities litigation.  (Doc. No. 47, Ex. B).  Where lead counsel have nationally recognized

expertise in this area, "there is no doubt that this standing enhanced [their] ability to prosecute

the case effectively and to negotiate credibly."  In re Ikon, 194 F.R.D. at 194.  The fact that

defense counsel are members of nationally recognized corporate defense firms with excellent

reputations serves to further bolster the quality of lead counsels' reputation.  See Id. at 194-95.

Given that the Third Circuit has noted that a goal of percentage fee awards is to encourage

competent counsel to undertake complex and unpredictable class litigation, this factor clearly

supports approval of counsels' request for attorneys' fees.  See Gunter, 223 F.3d at 198.

### 4.        Complexity and Duration of the Litigation

As discussed *supra*, securities fraud cases are difficult to litigate successfully.  This case

has been ongoing for more than ten years and required a thorough understanding of alleged

accounting fraud and Canadian bankruptcy law, which required a significant amount of work

with experts and consultants.  This case was taken on a contingency basis, so lead counsel have

yet to recoup any of the resources they have exhausted in litigating this case over the course of

tens years and negotiating its settlement.  This factor clearly weighs in favor of the requested

attorneys' fees.

### 5.        Risk of Nonpayment

There is a high risk of nonpayment in this case.  Lead counsel took this case, which is

inherently difficult to prove and unpredictable with regards to a jury, on a contingent fee basis.

The risk of nonpayment increased as a result of the bankruptcy stay that appeared would result of

dissolution of the company.  There is no question that this factor weighs toward awarding

17

attorney's fees to lead counsel.

### 6.    Amount of Time Devoted by Lead Counsel

Lead counsel have spent 1,535.25 hours and $15,583.00 in expenses on this case.  (Doc.

No. 46).  Although a stay has been in place during the majority of the time this action has been

pending, the declaration by one of the lead counsel reveals that a significant amount of effort has

been expended by lead counsel in litigating and negotiating this case.  Thus, this factor supports

the request for attorneys' fees.  See In re Lucent Tech., Inc. Sec. Litig., 327 F. Supp.2d 426, 430,

456 (D. N.J. 2004) (In "[o]ne of the largest settlements in securities class action litigation history

and particularly in post-Private Securities Litigation Reform Act" times where the attorneys

devoted 1,477 hours to the case, and the court noted that the factor supported the request given

the attorney's efforts in regards to the pleadings, motions, and negotiations.).

### 7.    Awards in Similar Cases

Although there is no hard and fast rule on determining the appropriate percentage that

should be awarded for attorneys' fees, courts in this circuit have determined that an appropriate

range for percentage fees in common fund cases is 19 percent to 45 percent.  In re Ikon, 194

F.R.D. at 194;  Lazy Oil Co. v. Wotco Corp., 95 F. Supp.2d 290, 341-42 (W.D. Pa. 1997);  In re

Smithkline Beckman, 751 F. Supp. at 533.  The court notes that a normal contingency fee in this

type of case would be 30 percent to 40 percent of the recovery and that courts have awarded 33

⅓ percent in many cases with settlement funds larger than $750,000.  See In re Corel Corp. Inc.

Sec. Litig., 293 F. Supp.2d 484, 497 (E.D. Pa. 2003) (awarded one third of $7 million settlement

fund after noting it was within the reasonable range);  In re Gen. Instrument, 209 F. Supp.2d at

433 (awarded one third of $48 million settlement fund and noted five cases in the circuit where

18

one third was awarded where the were settlement funds larger than $48 million); In re Ikon, 194 F.R.D. at 194 ("[I]n private contingency fee cases, particularly in tort matters, plaintiffs' counsel routinely negotiate agreements providing for between thirty and forty percent of any recovery."). Thus, awarding one third of the settlement fund for attorney's fees is consistent with precedent.

### 8.      Aid of Governmental Investigation

The Third Circuit has found that whether or not the lead counsel acted in concert with a governmental investigation is a significant factor to consider in determining whether or not to award the requested attorneys' fees, because it demonstrates whether or not the lead counsel can be credited with obtaining the entire value of the settlement fund for the class.  In re AT& T Corp., 455 F.3d at 173.  Where, as in this case, the lead counsel acted alone and the entire value of the settlement fund can be attributed to the efforts of the lead counsel, this factor supports the requested attorneys' fees.  See Id.

### 9.      Cross-Check

Requested attorney's fees should also be cross-checked under the lodestar method.  Id. at 164.  A lodestar award is calculated by multiplying the reasonable number of hours worked by the reasonable blended hourly billing rate based on the geographic area, the quality of the provided service, and the experience of the counsel.  In re Rite Aid Corp. Sec. Litig., 396 F.3d 294, 305-06 (3d Cir. 2005).  The multiplier can be used to increase or decrease the lodestar to adjust for the contingent nature and risks associated with the law suit and the quality of the work done by the lead counsel.  Id. at 305 n.13, 306.

Lead counsel expended 1,535.25 hours working on this case, at varying billable rates, which results in a total lodestar of $800,458.75.  (Document No. 46, Ex. 1).  Lead counsel are

19

requesting 33.33% of $750,000, which is $250,000.  Thus, the lodestar multiplier is .31.

Significantly, the Third Circuit has observed that the lodestar multipliers for settlements often

range from 1.35 to 2.99.  See Cendant PRIDES, 243 F.3d at 742.  The Third Circuit further noted

that such a "range is consistent with the principle that '[m]ultiples ranging from one to four are

frequently awarded in common fund cases when the lodestar method is applied.'"  Id. (quoting In

re Prudential, 148 F.3d at 341 (quoting 3 Herbert Newberg & Alba Conte, Newberg on Class

Actions, § 14.03 at 14-5 (3d ed.1992)))) (alteration in original).  Clearly, a lodestar multiplier of

.31 falls far below the typical range.  Thus, the cross-check demonstrates that the requested

attorneys' fees are reasonable.

      For the foregoing reasons, I conclude that the requested fee petition will be approved.

### C.    Reimbursement of Costs

      Lead counsel seek reimbursement for litigation expenses of $15,583.  The settlement

notice provided that lead counsel would seek reimbursement of approximately $15,600 in

litigation expenses.  As noted *supra*, no objections were filed regarding this or any other matter

in the notice of settlement.  Courts in this circuit have awarded lead counsel costs for filing fees,

expert consulting, telephone and fax charges, copying charges, computer assisted research, travel

expenses, and mailing charges where affidavits and billing records have been provided that

demonstrate the reasonableness of the requested costs.  See Perry v. FleetBoston Financial Corp.,

229 F.R.D. 105, 124 (E.D. Pa. 2005) (awarded $4,377.02 for these costs after reviewing

"submitted affidavits and detailed billing records");  In re SmithKline, 751 F. Supp. at 534

(awarded $202,460 for aggregate costs based on the "law firms' supporting records and

affidavits").  As other courts have noted, "'[t]here is no doubt that an attorney who has created a

common fund for the benefit of the class is entitled to reimbursement of . . . *reasonable* litigation expenses from that fund.'"  Ikon, 194 F.R.D. at 192 (quoting Lachance v. Harrington, 965 F. Supp. 630, 651 (E.D. Pa. 1997)) (emphasis in original).  In his declaration, one of the lead counsel testified that the un-reimbursed out-of-pocket expenses for meals, travel, transportation, filing and witness fees, messenger and overnight delivery, experts, consultants and investigators, copies, postage, telephone, fax, and online legal research are an accurate record of the expenses reflected from expense vouchers and check records.  (Doc. No. 46).  Since these categories are all considered expenses that are appropriate to reimburse in this circuit and the expenses appear to be reasonable, I see no reason to disallow any of them.

### D.      Reasonable Costs and Expenses

The class representative also requests that the court award him $15,000 for the time he expended in representing the class.  The settlement notice provided that a fee and expense award, which would not exceed $15,000, would be sought, and no objections to the award have been filed.

However, the PSLRA, which was enacted on December 22, 1995 and applies to this case,[10] provides that a class representative must file a sworn certification that "states that the plaintiff will not accept any payment for serving as a representative party on behalf of a class beyond the plaintiff's pro rata share of any recovery, except as ordered or approved by the court in accordance with paragraph (4)."[11]  15 U.S.C.A. § 78u-4(a)(2)(A)(vi).  Paragraph (4) of the

---

[10]PSLRA does not apply to any action "commenced before or pending on December 22, 1995."  See 15 U.S.C.A. 78u-4.  This lawsuit was filed on November 12, 1996, after the enactment of PSLRA.

[11]Smith certified this in a declaration signed on October 7, 1996 that is attached to the complaint.  (Doc. No. 1).

PSLRA provides:

> The share of any final judgment or of any settlement that is awarded to a representative party serving on behalf of a class shall be equal, on a per share basis, to the portion of the final judgment or settlement awarded to all other members of the class.  Nothing in this paragraph shall be construed to limit the award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class to any representative party serving on behalf of a class.

15 U.S.C.A. § 78u-4(a)(4).

Although the plaintiff acknowledges the provision in PSLRA, the plaintiff cites to numerous inapposite cases to support his request for $15,000.[12]

Since no courts in the Third Circuit have addressed this issue, I look to case law from other circuits for guidance.  Although it has been noted that not awarding an incentive to the lead plaintiff seems inconsistent with a goal of PSLRA to encourage "high-quality monitoring", where the lead plaintiff has not provided the court with actual expenses incurred, lost wages, and/or lost business opportunities as a result of representing the class, a number of district courts

---

[12]In re Cendant Corp. Derivative Action Litig., 232 F. Supp.2d 327, 338, 344 (D. N.J. 2002) (The court awarded a derivative plaintiff $25,000 incentive payment out of the proposed attorney's fees.  The Third Circuit previously held that the derivative plaintiff's objections to the settlement did not violate PSLRA, and the cases cited by the district court in support of the award were cases from before the enactment of PSLRA.  See In re Cendant Corp. Litig., 264 F.3d 286, 298-301 (3d Cir. 2001);  In re Cendant Corp. Derivative Action, 232 F. Supp.2d at 338.));  In re SmithKline Beckman, 751 F. Supp. at 525 (PSLRA did not apply to this case because PSLRA was not enacted until December 22, 1995, and this case was filed in 1988.);  In re Residential Doors Antitrust Litig., No. 94-3744, 1998 WL 151804 (E.D. Pa. Apr. 2, 1998)  (This is an antitrust lawsuit to which PSLRA does not apply, and, since it was pending before the enactment of PSLRA, PSLRA would not have applied even if it was a securities litigation action.  See Masters v. Wilhelmina Model Agency, Inc., 473 F.3d 424, 437 (2d Cir. 2007).);  Kolar v. Rite Aid Corp., No. 01-1229, 2003 WL 1257272 (E.D. Pa. Mar. 11, 2003)  (This is an ERISA action, to which PSLRA does not apply.  There was a related securities class action lawsuit to which PSLRA was applied, and in that case, awarding the lead plaintiff "reasonable costs and expenses" was not an issue.  In re Rite Aid Corp. Sec. Litig., 146 F. Supp.2d 706 (E.D. Pa. 2001).);  In re Plastic Tableware Antitrust Litig., No. 94-3564, 1995 WL 723175 (E.D. Pa. Dec. 4, 1995) (PSLRA does not apply to antitrust lawsuits, and would not have applied even if it had been a securities litigation case because it was filed before the enactment of PSLRA.);  In re Chambers Dec. Sec. Litig., 912 F. Supp. 852 (E.D. Pa. 1995) (PSLRA did not apply to this case because it was filed before the enactment of PSLRA);  Hall v. Midland Group and Midfirst Bank, No. 99-3108, 2000 WL 1725238 (E.D. Pa. Nov. 20, 2000), aff'd, 275 F.3d 35 (3d Cir. 2001) (This is a consumer class action to which PSLRA does not apply.).

have declined to award any reimbursement beyond the pro rata distribution.  See In re Nat'l, Inc. Sec. Litig., 02-3013, 2007 WL 623808, at *10 (S.D. N.Y. Mar. 1, 2007) ("Lead Plaintiffs have signed certifications pursuant to the PSLRA, but their affidavits fail to explain how they determined their asserted hourly 'lost wages.' . . . Without a better explanation for claims of $200-800 per hour of 'lost wages,' the Court should decline to award such amounts.);  In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig., Nos. 02-1484, 02-3176, 02-7854, 02-10021, 2007 WL 313474, at 24-25 (S.D. N.Y. Feb. 1, 2007) ("Although [the lead plaintiff] claims to have spent time during her work day performing her duties as lead plaintiff, she nevertheless fails to claim any actual expenses incurred, or wages or business opportunities she lost, as a result of acting as lead plaintiff.  Under the PLSRA, it is simply not enough . . . to assert that she took time out of her workday and that her time is conservatively valued at $500 per hour."); Swack v. Credit Suisse First Boston, LLC, No. 02-11943, 2006 WL 2987053, at *2-5 (D. Mass. Oct. 4, 2006) ("Since Congress specifically chose to limit recovery in PSLRA cases to 'reasonable costs and expenses (including lost wages) directly relating to the representation of the class,' . . . I find that a representative plaintiff must provide the court with meaningful evidence demonstrating his or her actual costs and expenses (including lost wages)."); In re KeySpan Corp. Sec. Litig., No. 01-5852, 2005 WL 3093399, at *20-21 (E.D. N.Y. Sept. 30, 2005) ("Counsel fail to provide any basis for determining what reasonable costs and expenses were incurred [by lead plaintiffs]. Counsel have not shown how the time expended by the Class Representative and Lead Plaintiffs resulted in actual losses, whether in the form of diminishment in wages, lost sales commissions, missed business opportunities, use of leave or vacation time or actual expenses incurred. Without any proof or detail in this regard, I recommend that Class

Representative and Lead Plaintiffs not be awarded any payment beyond their pro rata share of the settlement."); In re AMF Bowling, 334 F. Supp.2d 462, 470 (S.D. N.Y. 2004) (The court noted that some district courts were not requiring a showing of out of pocket expenses, lost time at work, loss of vacation time, loss of commissions, or loss of business opportunities, but stated that Congress "could have decided to allow class representatives to make fee applications based upon their time charges," and noted there was no indication that Congress intended that.).

Other district courts have awarded lead plaintiffs in PSLRA cases incentive awards or not required the alleged costs and expenses to be detailed.  Hicks v. Stanley, No. 01-10071, 2005 WL 2757792, at *10-11 (S.D. N.Y. Oct. 24, 2005) (The court cited non-PSLRA cases for support.); In re Heritage Bond Litig., Nos. 02-1475, 01-5752, 02-382, 02-993, 02-2745, 02-6484, 02-6841, 02-9221, 02-6512, 2005 WL 1594403, at *3-4 (C.D. Cal. June 10, 2005) (In support of the award, the court cited to an ERISA case, two non-PSLRA cases, and a PSLRA case that awarded the requested amounts with no explanation other than that they were reasonable.); In re Xcel Energy, Inc., 364 F. Supp.2d 980, 1000 (D. Minn. 2005) (In awarding the requested money, the court cites to non-PSLRA cases where the courts awarded incentive awards.); In re Infospace, Inc., 330 F. Supp.2d 1203, 1216 (W.D. Wash. 2004) (The court noted without further explanation that the requested amounts were reasonable.).

The district courts that have awarded incentive awards or requested amounts without requiring any explanation or detailing of the alleged costs in cases where PSLRA clearly applies, appear to be ignoring the clear language of PSLRA.  The class representative failed to provide this court with any evidence of actual expenses incurred, lost wages, lost vacation time, or lost business opportunities.  I conclude that the class representative has failed to demonstrate that he

has incurred any "reasonable costs and expenses" that can be awarded under PSLRA.  Thus, the court will not award Smith anything beyond his pro rata share of the settlement fund.

## IV.   CONCLUSION

This Court will approve the class action settlement of $750,000 as fair, reasonable and adequate under Federal Rule of Civil Procedure 23.  This court will further approve the petition for attorneys' fees in the amount of $250,000 and the reimbursement of lead counsel's expenses of $15,583.00.  The court denies any award to the class representative beyond his pro rata share of the settlement fund.

An appropriate Order follows.

# IN THE UNITED STATES DISTRICT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JAMES B. SMITH, On Behalf of Himself and Others Similarly Situated,** | : | **CIVIL ACTION** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **NO. 96-7580** |
| | : | |
| **DOMINION BRIDGE CORPORATION (f/k/a CEDAR GROUP, INC.), MICHEL L. MARENGÈRE and NICOLAS MATOSSIAN,** | : | |
| | : | |
| **Defendants.** | : | |

## <u>ORDER AND FINAL JUDGMENT</u>

And now, on this 11th day of April 2007, upon consideration of plaintiff James B. Smith's memorandum of law in support of motion for final approval of the proposed settlement and the plan of allocation (Doc. No. 48), and plaintiff's memorandum of law in support of application for attorneys' fees and reimbursement of expenses (Doc. No. 49), and having held a hearing on January 22, 2007 to determine:  (1) whether the terms and conditions of the stipulation of settlement dated October 4, 2006 are fair, reasonable, and adequate for the settlement of all claims asserted by the class against the defendants in the complaint now pending in this court under the above caption, and should be approved; (2) whether judgment should be entered dismissing the complaint on the merits and with prejudice in favor of the defendants and as against all persons or entities who are class members herein, who have not requested exclusion therefrom; (3) whether the plan of allocation should be approved as a fair and reasonable method to allocate the settlement proceeds among the class members, and (4) whether and what amount to award for the lead counsel's attorneys' fees, reimbursement of lead counsel's expenses, and the class representative's reasonable costs and expenses, and for the reasons set forth in the

foregoing memorandum, as well as having made the following findings and conclusions:

A.      The court has jurisdiction over the subject matter of the action, the plaintiff, all class members, and the defendants pursuant to 28 U.S.C. § 1331.  All capitalized terms used herein shall have the meanings defined in the stipulation of settlement.

B.      By order dated March 6, 1998, this action was preliminarily certified to proceed as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all persons and entities who purchased Dominion Bridge Corp. common stock only on the NASDAQ Stock Exchange during the period of April 20, 1995 through May 18, 1996, inclusive, with respect to any claims for damages or other relief under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t, and Rule 10b-5, 17 C.F.R. 240.10b-5, which was promulgated thereunder.  The facts underlying that order have not changed since the issuance of that order and, therefore, for the reasons provided in that order, this lawsuit meets the requirements of Rule 23 for maintaining this law suit as a class action.

The prerequisites for a class action under Rule 23(a) and (b)(3) have been satisfied in that:  (a) the number of class members is so numerous as to make joinder impracticable; (b) there are questions of law and fact common to the class; (c) the claims of the class representative are typical of the claims of the class he seeks to represent; (d) the class representative has and will fairly and adequately represent the interests of the class; (e) the questions of law and fact common to the members of the class predominate over any questions affecting only individual members of the class; (f) a class action is superior to other available methods for the fair and efficient adjudication of the controversy; and (g) counsel, preliminarily approved to represent the class, possess now and have possessed throughout the litigation the requisite competence,

2

experience, dedication, knowledge, training, objectivity, and resources to adequately litigate the claims and defenses raise by the parties to this class action and remain approved as counsel for the class.

C.      More than 3,848 individual copies of a notice of the proposed settlement and the hearing substantially in the form approved by the court were mailed to all persons or entities reasonable identifiable, who purchased the common stock of Dominion Bridge Corp. during the class period, except those persons or entities excluded from the definition of the class, and a summary notice of the hearing substantially in the form approved by the court was published in the national publication, PR News Wire, pursuant to the direction of the court.  Such persons or entities were notified, *inter alia*, of the proposed settlement, their right to file objections, and the date of the fairness hearing.  Notice of the pendency of this action as a class action and of the proposed settlement was given to all class members who could be identified with reasonable effort.  This constitutes a sufficient notice process complying in all respects with the Rules of Civil Procedures, orders of this court, and the constitutional requirements of due process.

D.      The court has considered all matters submitted to it at the hearing and otherwise.

E.      The court has considered and determined the fairness and reasonableness of the settlement, the plan of allocation, an award of attorneys' fees, and requested reimbursement.

F.      Settlement:

(a)      The proposed stipulation of settlement filed in this case on October 23, 2001 (Doc. No.44), embodies the terms of the proposed settlement with the exception of the inclusion in the class definition of those persons and entities who acquired Dominion common stock during the relevant time period through the Vancouver Stock Exchange.

3

(b)     The proposed settlement is the result of non-collusive, intensive negotiations between experienced counsel.

(c)     For all of the reasons provided in the foregoing memorandum, the proposed settlement fairly, reasonably, and adequately advance the interest of the class, as certified, and the plan of allocation is fair and reasonable.

G.     Counsel Fees and Costs: For all of the reasons provided in the foregoing memorandum, the request for counsel fees and reimbursement of expenses is fair and reasonable.

**ACCORDINGLY IT IS HEREBY ORDERED THAT:**

1.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, this court finally **CERTIFIES** this action as a class action on behalf of all persons who purchased the common stock of Dominion Bridge Corp. on the NASDAQ Stock Exchange during the period from April 20, 1995 to May 18, 1996, inclusive, with respect to any claims for damages or other relief under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t, and Rule 10b-5, 17 C.F.R. 240.10b-5, which was promulgated thereunder.  Excluded from the class are the defendants (Dominion Bridge Corporation, Michel L. Marengere, and Nicolas Matossian); Related Parties; any present or former officers and directors of Dominion Bridge Corp. and/or any of its subsidiaries, legal representatives, heirs, successors, or assigns; and any entity in which Dominion had or has had a controlling interest.

2.     The settlement is **APPROVED** as fair, reasonable, and adequate; the class members and the parties are directed to consummate the settlement in accordance with the terms and provisions of the stipulation date October 4, 2006.  (Doc. No. 44).

3.     The complaint is **DISMISSED** with prejudice and without costs, except as

4

provided in said stipulation, as against the defendants.

4.      Class members and the successors and assigns of any of them are permanently **BARRED** and **ENJOINED** from instituting, commencing, or prosecuting all Released Claims (including Unknown Claims) against the Released Persons, whether or not such settlement class member executes and delivers the Proof of Claim and Release.  The settled claims are compromised, settled, released, discharged, and dismissed as against the Released Persons on the merits and with prejudice by virtue of the proceedings herein and this order and final judgment.

5.      The Released Persons are permanently **BARRED** and **ENJOINED** from instituting, commencing, or prosecuting all claims (including Unknown Claims), arising out of, relating to, or in connection with the institution, prosecution, assertion, or resolution of the Litigation or the Released Claims.  The settled defendants' claims are compromised, settled, released, discharged, and dismissed on the merits and with prejudice by virtue of the proceedings herein and this order and final judgment.

6.      Neither this order and final judgment, the stipulation, nor any of its terms and provisions, nor any of the negotiations or proceedings connected with it, nor any of the documents or statement referred to therein shall be:

(a)      deemed to be or may be used as an admission of, or evidence of, the validity of any Released Claim, or of any wrongdoing or liability on the part of any of the Released Persons;

(b)      deemed to be or may be used as an admission of, or evidence of, any fault or omission of any of the Released Persons in any civil, criminal, or administrative proceeding in any court, administrative agency, or other tribunal, other than in such proceedings as may be

necessary to consummate or enforce this stipulation, or the settlement provided for, or the judgment, except that the Released Persons may file this stipulation and/or the judgment in any action that may be brought against them in order to support a defense or counterclaim based on the principles of *res judicata*, collateral estoppel, release, good faith settlement, judgment bar or reduction, or any other theory of claim preclusion or issue preclusion or similar defense or counterclaim.

7.      The application of James B. Smith for an award of $15,000 as the value of the time expended by him performing his duties as class representative is **DENIED** for the reasons set forth in the above memorandum.

8.      The plan of allocation is otherwise **APPROVED** as fair and reasonable, and lead counsel and the claims administrator are directed to administer the stipulation in accordance with its terms and provisions.  The escrow agent should certify to the court, with supporting certification by the claims administrator, that all settlement funds have in fact been paid to the authorized claimants, along with an accounting thereof, within one year of the entry of the final order and judgment.  Such certifications should detail efforts to identify and locate missing claimants and/or authorized claimants, as appropriate.

9.      Lead counsel are awarded 33 ⅓ percent of the settlement amount in fees, which the court finds to be fair and reasonable, and $15,583.00 in reimbursement of expenses.  The award of attorneys' fees shall be allocated among plaintiff's counsel in a fashion which, in the opinion of plaintiff's counsel, fairly compensates plaintiff's counsel for their respective contributions in the prosecution of the action.

10.      This court shall retain jurisdiction over the parties and the class members for all

matters relating to this action, including administration, interpretation, effectuation, or enforcement of the stipulation and this order and final judgment, and including any application for fees and expenses incurred in connection with administering and distributing the settlement proceeds to the class members.

11.     All parties shall comply with their obligations under the settlement and plan of allocation.

12.     Without further order of the court, the parties may agree in writing to reasonable extensions of time to carry out any of the provisions of the stipulation, provided that such agreements shall be seasonably filed of record.

**IT IS FURTHER ORDERED** that the stipulation of settlement, with the exception of the class definition and the proposed award to lead plaintiff, dated October 4, 2006 (Doc. No. 44), is hereby adopted by the court, is incorporated into this order by reference thereto, and shall have the full force and effect of an order of this court.

**THIS IS A FINAL ORDER.**

S/Lowell A. Reed, Jr.
Lowell A. Reed, Jr., Sr. J.